**TIME WARNER CABLE, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 97–1524.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 4, 1998.

Decided Nov. 6, 1998.

Jon W. Tryon argued the cause for the petitioner.

Leslie Randolph, Attorney, National Labor Relations Board, argued the cause for the respondent. Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel at the time the brief was filed, and Peter Winkler, Attorney, were on brief. John D. Burgoyne, Acting Deputy Associate General Counsel, entered an appearance.

Before: WILLIAMS, HENDERSON and GARLAND, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Time Warner Cable, Inc. (Time Warner) petitions for review of an order of the National Labor Relations Board (NLRB or Board) concluding that it engaged in an unfair labor practice by refusing to bargain with the Communication Workers of America, Local 1120 (Union). *Time Warner Cable*, 324 N.L.R.B. No. 25 (Aug. 5, 1997). The NLRB cross-applies for enforcement of its

order. Time Warner admitted that it refused to bargain but challenged the validity of the Union's certification based on the NLRB's disqualification of a challenged, and potentially determinative, ballot. As explained below, we conclude that the NLRB's decision was not based on substantial evidence and therefore, grant Time Warner's petition and deny the Board's cross-application for enforcement.

## I.

On March 5, 1995, the Union petitioned the NLRB seeking certification as the exclusive collective bargaining representative at Time Warner, formerly Paragon Communications d/b/a Paragon Cable of Newburgh, New York (Cable),[1] for "all fulltime and regular part-time service technicians ... employed by the employer at or out of its 400 Auto Park Place, Newburgh, New York facility." Paragon Communications d/b/a Paragon Cable, Hearing Officer's Report (Sept. 18, 1996) (hereinafter Hearing Officer's Report), Joint Appendix (JA) 7A. The original election ended in a tie and the Union filed an objection alleging management misconduct. The NLRB agreed with the Union and on September 25, 1995, it ordered a second election. The Notice of Second Election also specified the eligible voters:

> Included: All full-time and regular part-time service technicians, installer technicians, warehouse coordinators, customer service representatives, production staff, and dispatchers employed by the employer at or out of its 400 Auto Park Place, Newburgh, New York Facility;
>
> . . .
>
> Eligible voters are those in the unit who were employed during the payroll period ... [ending September 15].

Paragon Communications d/b/a Paragon Cable, Notice of Second Election (Sept. 18, 1996), JA 1A–2A. The rerun election was conducted on October 6, 1995. Of the twen-

1. Time Warner's predecessor and Primestar operated as divisions of Paragon Communications Northeast Division (Paragon Northeast), which operated cable and satellite systems for Time Warner in New York, New Hampshire and Maine. Cable was one of nine cable television operations Paragon Northeast operated and Primestar was one of its two satellite service divisions. Paragon Communications d/b/a Paragon Cable, Hearing Officer's Report (Sept. 18, 1996), Joint Appendix (JA) 11A. Paragon Northeast has since been disbanded. *Id.*

ty-eight ballots cast, fourteen were for unionization, thirteen were against and the Union challenged one ballot, cast by Willie Jackson. JA 8A.

Cable had hired Jackson in February 1994 as an installer and promoted him to the position of installer technician in August 1994, at which time he received a raise. JA 12A. After an initial orientation period, Jackson was assigned a vehicle and generally worked alone, performing installation and some repair work. *Id.* In March 1995 Jackson applied for and received a higher paid position performing similar work for Primestar. At Primestar Jackson oversaw "quality control of the work performed by contractors retained to install satellite dishes." *Id.*

While the Union initially challenged Jackson's ballot on the ground that he was a member of management, *id.* at 10A, it changed its position during the hearing to challenge whether Cable had employed Jackson in the unit as of the eligibility date. *Id.* The hearing officer then issued a subpoena for relevant documents[2] and allowed testimony on the Union's new issue. *Id.* at 8A–9A n. 2. The Union, however, called no additional witnesses on the issue. It had already called Jackson to testify on the management member issue and Cable then called Gemma Slacik, Paragon Northeast's area manager. Based on perceived inconsistencies between their testimony and the documentary evidence, the hearing officer decided that Jackson was not a regular part-time employee as of the eligibility date. *Id.* at 17A–19A. She concluded that "as of September 15, the payroll eligibility date herein, Jackson had a conditional promise of employment, but had not yet returned to work as a regular, part-time employee" of Cable. *Id.* at 20A. Noting an earlier Board decision that had declared ineligible an employee who was in the bargaining unit before the eligibility date but had not performed unit work for a " 'sufficiently substantial amount of time,'" the hearing officer implied a similar fate for Jackson. *Id.* at 20 n. 11 (quoting *Meadow*

*Valley Contractors,* 314 N.L.R.B. 217, 217 (1994)).

Cable filed exceptions to the hearing officer's report and on January 15, 1997 the Board issued an order denying oral argument and affirming the hearing officer. *In re Paragon Communications d/b/a Paragon Cable,* 2–RC–21521 (Jan. 15, 1997), JA 24A. On March 28, 1997, the Union filed an unfair labor practice charge alleging that Cable violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act (Act), 29 U.S.C. §§ 151 *et seq.* by refusing to bargain. Cable admitted its failure to negotiate but challenged the Union's status as the exclusive bargaining representative. On August 5, 1997 the Board concluded that "[a]ll representation issues raised by [Cable] were or could have been litigated in the prior representation proceeding," *Time Warner Cable,* 324 N.L.R.B. No. 25, at 1 (Aug. 5, 1997), granted the General Counsel's summary judgment motion and ordered Cable to cease and desist from violating sections 8(a)(1) and 8(a)(5) of the Act. *Id.* at 2. Cable petitioned for review, invoking this Court's jurisdiction pursuant to section 10(f) of the Act.

## II.

Our role in reviewing the NLRB's findings of fact is limited. We will reverse the NLRB only if its findings are not "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *see also Universal Camera Corp. v. NLRB,* 340 U.S. 474, 493, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We also give substantial deference to the inferences drawn by the NLRB from the facts. *Peoples Gas Sys., Inc. v. NLRB,* 629 F.2d 35, 42 (D.C.Cir.1980). We do not, however," 'merely rubber stamp NLRB decisions,'" *Davis Mem'l Goodwill Indus. v. NLRB,* 108 F.3d 406, 410 (D.C.Cir.1997) (quoting *Avecor, Inc. v. NLRB,* 931 F.2d 924, 928 (D.C.Cir.1991)) and, in reviewing the findings, we must "take into account whatever in the record fairly detracts from [their] weight." *Universal Camera,* 340 U.S. at 488, 71 S.Ct. 456.

---

**2.** The subpoena directed Paragon to produce Jackson's payroll records and timesheets for

June 1, 1995 to September 30, 1995. JA 151.

In order to vote in a representation election, an employee must be "employed and working on the eligibility date." *NLRB v. Dalton Sheet Metal Co.*, 472 F.2d 257, 258 (5th Cir.1973). At the hearing both Jackson and Slacik testified without contradiction that Jackson was employed by and working for Cable as of the eligibility date. JA 42–43 (Jackson's testimony); *id.* at 127, 130–31 (Slacik's testimony). Jackson testified that in August 1995[3] Slacik approached him about returning to work for Cable because Cable was understaffed. Jackson testified that he accepted the position parttime, effective immediately, planning to work for Primestar on Monday and Friday and for Cable on Tuesday, Wednesday and Thursday. Because of the short notice, however, he and Slacik agreed that if Jackson needed additional time for Primestar work, Slacik would allow it. JA 61. Slacik likewise testified that Jackson was working at Cable before the eligibility date. She testified that when she learned that Primestar was relocating its Newburgh operations to Binghamton, New York, she met with Jackson about his returning to Cable. JA 127. She made a record of the meeting in a September 8 memorandum, noting that on September 6 she met with Primestar's general manager (Eric Behre) and Jackson and informed Jackson in confidence that Primestar was relocating. The memorandum also noted that "[i]t was determined as a result of this meeting that Willie [Jackson] fit the Installer/Tech 2 job description and salary range and he was rehired on a part-time basis until the Primestar office officially closed at which time he would become a full-time employee." JA 221. Finally, the memorandum noted that on September 7 Jackson accepted the offer.

Rejecting this evidence, the hearing officer first focused on the Employee Change Request Turnaround Document (turnaround form) that Cable prepared in connection with Jackson's return. JA 18A. She noted that the turnaround form indicated an "Effective Date" of September 22 and that Slacik had testified that personnel actions were only proposals until approved by either Joan Judge, Paragon Northeast's Human Resources Director, or Paragon Northeast's President, Robert Merlese.[4] *Id.* at 18A. But the hearing officer's reliance on the turnaround form ignored the relationship that existed between Primestar and Cable. First, both were part of the Paragon Northeast and, until its relocation, Primestar shared office and warehouse facilities with Cable. *Id.* at 13A. Second, Paragon Northeast paid the employees, including Jackson, of both Cable and Primestar. JA 133A. Third, Jackson's 1995 transfers between Primestar and Cable were effectuated by internal transfer procedures, he reported to the same facility throughout his employment, *id.* at 13A, and he retained the same benefits package. JA 133A–37A. In addition, nothing in Slacik's testimony suggested that a personnel change that eventually failed to receive Judge's or Merlese's approval was void ab initio rather than simply reversed. For example, nothing indicated that a transferred employee would not be paid because he had worked in his "new" (but ultimately disapproved) position. JA 120A. Thus, the testimony that a transfer was not "final" until approved by Judge or Merlese does not determine whether, and when, Jackson worked in the new position. Given these factors, we do not believe that the September 22 "[e]ffective" date overrides the uncontested testimony that Jackson was in fact employed by and working for Cable as of September 15.[5] JA 41–43, 59, 130–31.

The hearing officer also disregarded Slacik's September 8 memorandum as evidence that Jackson had returned to work for Cable before the September 15 eligibility date based on inconsistencies she perceived in evidence regarding Jackson's and Slacik's August and early September meetings. The

---

3. All dates referred to occurred in 1995 unless otherwise noted.

4. Neither Judge nor Merlese testified.

5. We do not, however, agree with Time Warner that the September 22 date was an "apparent clerical error." Pet'r Br. at 18. The document manifests that the date was changed from (perhaps) a single-digit date in September to September 22 by the hand notation of "JJ," presumably Joan Judge. JA 244.

testimony on the issue was limited,[6] however, and the inconsistencies were not necessarily inconsistencies or, if they were, they were, at most, trivial. First, the hearing officer noted that Slacik testified that she approached Jackson because Primestar was relocating, JA 18A, while Jackson testified that Slacik approached him because of a personnel shortage at Cable, JA 19A. The hearing officer also noted Jackson's testimony that management told him about Primestar's relocating during an October 13 employee meeting[7] as well as Jackson's failure to testify, when he was asked: "[D]id Ms. Slacik tell you why she was asking you to come back to [Cable]?" JA 43, that he intended to become a fulltime Cable employee once Primestar relocated. But the Union never asked *Slacik* why she met with Jackson. Instead the hearing officer concluded that Primestar's relocation was Slacik's only reason for meeting with Jackson based merely on Cable's question to Slacik on direct examination that she explain her September 8 memorandum.[8] And Jackson's testimony regarding Primestar's relocation also arose from the single question, "Mr. Jackson, has anyone told you what's going to happen to Primestar?" JA 72A. Jackson was never asked when he *first*, and confidentially, heard about the relocation.[9]

Finally, the hearing officer discredited Jackson's timesheets. She noted that for the weeks ending September 8 and 15 the timesheet showed that Jackson received eight hours of "holiday pay," seventy-two hours of

"regular pay" and three hours of "overtime"; the timesheet, however, failed to attribute the overtime or holiday pay to either Primestar or Cable. JA 16A. The hearing officer emphasized the hand-printed notation:

Cable 16 HRS

Primestar 64 HRS.

*Id.* She noted that Slacik initialed the notation and that in her opinion Jackson did not print the notation. *Id.* Jackson's timesheet for the weeks ending September 22 and 29 contained similar hand-printed notations. Based on "the disparity between the time recorded as compared to that which was allocated [the three-day, two-day allocation], the ambiguity as to who noted the breakdown of Jackson's time,[10] and the discrepancy between the hours allocated to Cable during this two-week period and Jackson's *clear* testimony" (emphasis added), the hearing officer concluded that she could not "rely upon these documents to establish when Jackson commenced working at Cable." *Id.* at 20A.

At least two of the hearing officer's three reasons for rejecting the timesheets' credibility, however, are not supported by the record. The "disparity" between the recorded and the allocated times, that is, the difference between the Primestar (Monday and Friday) and Cable (Tuesday, Wednesday, Thursday) allocations, on the one hand, and the recorded 16 hours for Cable and 64 hours for Primestar, on the other, was expressly anticipated as Jackson's testimony and Slacik's September 8 memorandum make

---

6. As noted earlier, the Union originally challenged Jackson's ballot on the ground that he was a member of management. The theory that Jackson was not working in the bargaining unit as of the eligibility date did not arise until the middle of Slacik's testimony, after Jackson had testified. JA 110.

7. Jackson testified:

Q [Cable]: "Mr. Jackson, has anyone told you what's going to happen to Primestar?"
A [Jackson]: "Yes. We had a—on October 13th, the new General Manager came down. We had a meeting. And what we learned is that, it will no longer list—remain Primestar." JA 72A.

8. Slacik testified:

Q [Cable]: Would you please explain that document?

A [Slacik]: [The September 8, 1995 memo is a memo] to Willie Jackson's file from me ... which details the discussion that we had with Willie Jackson when we found out that Primestar Satellite Services was going to be moving ...
And it just pretty much details discussions that we had in [sic] the offer we put on the table.... JA 127.

9. In rejecting Slacik's September 8 memorandum, the hearing officer also noted that it listed September 7 as the date of reemployment while Slacik dated her signature on the turnaround form on September 6. JA 19A. We fail to see any significance in the different dates.

10. Neither Jackson nor Slacik was asked whose handwriting was on the timesheets.

clear.[11] And the "discrepancy" between the 16 hours allocated to Cable and Jackson's "clear" testimony also disappears when Jackson's actual testimony is reviewed. He testified that "Slacik has been relaxed in that manner. If I have deliveries or something comes up, that I can get—let them know what problems might arise at Primestar, that I may go back and take care of that." JA 61.

 Finally, the hearing officer's footnote inference that Jackson, even if he was doing unit work as of September 15, had not worked for a "'sufficiently substantial amount of time,'" JA 20 n.11 (quoting *Meadow Valley Contractors*, 314 N.L.R.B. at 217), is unsupported by the record. The NLRB determines the right of a dual-function[12] employee to vote in a bargaining unit representation election by weighing whether the employee "regularly performs duties similar to those performed by unit employees for sufficient periods of time to demonstrate that [he has] a substantial interest in the unit's working conditions." *Martin Enters., Inc.*, 325 N.L.R.B. No. 133, at 2 (April 30, 1998). The NLRB "has no bright line rule as to the amount of time required to be spent in performing unit work. Rather, the [NLRB] examines the facts in each particular case." *Id.*

After his meeting with Slacik, which, it bears noting, occurred *before* the eligibility date had been set, Jackson returned to unit employment. *See* JA 1A–2A. In the two weeks immediately preceding the eligibility cut-off date, August 30 to September 15, Jackson worked sixteen hours for Cable according to his timesheet. JA 238. In the two weeks after the eligibility cut-off date, September 16 to September 29, Jackson worked twenty-four hours for Cable according to his timesheet.[13] JA 239. *Cf. Stockham Valve & Fittings, Inc.*, 222 N.L.R.B. 217 (1976) (finding eligible part-time employees who were hired month before election and who worked five days by election day). At a minimum, then, Jackson worked forty hours in the unit before the election and unit work accounted for at least thirty per cent of his time in two of the three weeks between the eligibility date and the election. The Board has identified no case in which an employee worked as high a percentage of hours in the bargaining unit in the weeks before the election date and yet was denied voting rights. In the absence of such precedent, we believe this work level demonstrates a sufficient interest in the bargaining unit's conditions of employment to warrant his inclusion in the unit, especially in light of the surrounding circumstances. First, Jackson began unit work *before* the eligibility date was set. Second, Jackson's hours *increased* during the relevant time period as Jackson transferred parttime into the unit. Third, Jackson worked the hours as part of a permanent return to the unit. JA 221. These circumstances make clear that Jackson worked in the unit for a sufficient time to demonstrate Jackson's substantial interest in the unit's working conditions and, thus, his eligibility to vote.

### III. Conclusion

Notwithstanding the substantial deference we give to NLRB orders, we do not find substantial evidence in this record to support its conclusion that Jackson was not employed and working in the bargaining unit as of the

---

11. Jackson testified:
 Q [Union]: Now, you testified that Ms. Slacik—if you have work that you need to do for Primestar on Tuesday, Wednesday or on Thursday, Ms. Slacik allows you to do that? A [Jackson]: We made an agreement that if we had a problem that, if we had a problem that came—arose, as far as a delivery of some equipment, that I could let her know and she would allow me the time to go back and take care of that.
 JA 71. Slacik's September 8 memo noted: "As issues of Primestar closure came up, [Primestar management and I] would work together to resolve them, even if that meant changing the agreed upon schedule." JA 221A.

12. The dual-function analysis is used for employees "who perform more than one function for the same employer." *Martin Enters., Inc.*, 325 NLRB No. 133, at 2 (April 30, 1998). To determine the eligibility of a dual-function employee the Board uses the part-time employee test. *Textron Lycoming Div., Avco Corp.*, 308 N.L.R.B. 1045, 1045 (1992).

13. The NLRB has considered post-eligibility date work in determining the eligibility of both dual-function and part-time employees. *See, e.g., Meadow Valley*, 314 N.L.R.B. at 217; *Stockham Valve & Fittings, Inc.*, 222 N.L.R.B. 217 (1976).

eligibility date. We further find the hearing officer's alternative, and inferential, conclusion that Jackson worked insufficient hours to demonstrate a "substantial interest in the terms and conditions of employment" unsupported. Accordingly, we grant Time Warner's petition, deny the Board's cross-application for enforcement and order that the ballot of Willie Jackson be opened and counted.

*So ordered.*