MOHAVE ELECTRIC
COOPERATIVE,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 98–1522.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 14, 1999.

Decided March 28, 2000.

Thomas J. Kennedy argued the cause for petitioner. With him on the briefs were Gregg J. Tucek, William P. Allen, and Neil I. Levy.

Preston L. Pugh, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and David Habenstreit, Supervisory Attorney. John D. Burgoyne, Deputy Associate General Counsel, entered an appearance.

Before: GINSBURG, HENDERSON, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Mohave Electric Cooperative, Inc. petitions for review of a decision and order of the National Labor Relations Board (NLRB), which concluded that the company unlawfully discharged employee Rich-

ard Michaels for protected concerted activity in violation of section 8(a)(1) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1). The NLRB cross-petitions for enforcement of its order. We deny the petition for review and grant the cross-petition for enforcement.

# I

Mohave is an electric utility operating out of Bullhead City, Arizona. It has approximately seventy employees, roughly twenty of whom are represented by the International Brotherhood of Electrical Workers, Local 769, AFL–CIO ("the Union"). The bargaining unit consists of linemen, mechanics, warehousemen, and between eight and twelve meter readers. The latter are responsible not only for reading electric meters, but also for meter installation, meter connection and disconnection, and other related duties. Gene Quinn supervises Mohave's meter department and reports to Tom Longtin, the operations manager.

Consistent with the terms of its collective bargaining agreement (CBA), Mohave uses several subcontractors to supplement its work force. One subcontractor, Guard Force, has provided Mohave with additional meter readers since 1993. Guard Force employees wear uniforms like those of Mohave meter readers, and they work out of the same room on Mohave's premises. Although they have their own on-site supervisor, David Drabek, he reports to Mohave's Gene Quinn. *See Mojave Elec. Coop.*, 327 N.L.R.B. No. 7, 1998 WL 777462, at *4 (Oct. 30, 1998); Tr. at 74.[1] Hence, all meter readers—whether employed directly by Mohave or by a subcontractor—come within the scope of Quinn's supervisory responsibility.

Richard Michaels worked as a meter reader for Mohave from August 1991 until his termination on June 3, 1996. He was one of two union stewards at the Mohave facility and served on a number of the Union's committees. His work history was generally uneventful until May 1996.

The parties dispute the details of the events that began that month and that ultimately culminated in Michaels' discharge. The Administrative Law Judge (ALJ) who heard the case found that on the morning of May 8, Michaels called Drabek, the Guard Force supervisor, to complain that a Guard Force employee had insisted that Michaels trade meter-reading routes for the day. Following that conversation, Drabek reported to Mohave that Michaels had been rude to him. Michaels denied the allegation, and his supervisor, Quinn, ended the matter by finding that Michaels "had acted properly." *Mojave Elec.*, 1998 WL 777462, at *5.

Later that same month, Michaels learned from a friend that someone wearing a Mohave uniform had been stopped at a local grocery store for shoplifting. Pursuant to company policy, Michaels reported this to Quinn, who in turn advised Longtin, Mohave's operations manager, and Jay Nady, the owner of Guard Force. According to Nady and Longtin, the story that reached them was that Michaels had reported that the person wearing the Mohave uniform was a Guard Force employee, who had been handcuffed and driven away by the police. The actual facts were somewhat less dramatic: there had been no police arrest; the store's own security force had stopped the Guard Force employee, who claimed to have "forgotten" to pay for an item he took from the store. Nady and Longtin concluded that Michaels had exaggerated the story in order to discredit Guard Force. At the hearing before the ALJ, however, Michaels testified that he had merely reported what he had heard—that someone wearing a Mohave uniform had been stopped for shoplifting—and nothing more. Based on the demeanor of the witnesses, the ALJ found Michaels' testimony substantially more credible than that of Nady and Longtin. He

1. Although the Board employs the spelling "Mojave," we use the spelling employed by the petitioner in this court.

therefore credited Michaels' testimony and concluded that if there had been any exaggeration, it had been by Mohave's supervisors rather than Michaels.

On May 21, angry about the alleged exaggeration, Nady went to Mohave's facility "to confront and straighten out Michaels." *Id.* at *6 (internal quotation omitted). Unable to find him, Nady instead located Stuart Douglas, another Mohave meter reader whom Nady had often seen with Michaels. Although the parties dispute the details of the encounter, it appears that Nady asked Douglas about Michaels' whereabouts and that there was a brief physical confrontation between them.[2]

The next day, when Michaels returned to work, Douglas told him that he had been physically and verbally assaulted by Nady, and that Nady had been "looking for" Michaels when this occurred. Michaels promptly told his supervisor that he felt threatened, and he asked the company for protection. Quinn told him to "give it a couple of days" and took no further action, although later Longtin did advise Nady that Mohave "reserved to itself any issues of supervision or discipline of its employees." *Id.* at *7. Concerned about their physical safety, Michaels and Douglas met with their coworkers and discussed their options. They described Nady's alleged assault on Douglas and stated that they were considering turning to the courts for protection. Michaels gave uncontradicted testimony that the other employees agreed with and supported such action. *See* Tr. at 189–90.

On May 23, in Bullhead City municipal court, Michaels and Douglas filed petitions for injunctions against harassment, citing their need for protection from "verbal and mental abuse and possibly physical violence" by Nady and Drabek. App. at 139–43. The petitions requested that Nady and Drabek have no contact with Douglas and Michaels, and that they be enjoined to stay away from the petitioners' homes and place of employment.

On May 29, Nady received copies of the petitions and immediately contacted Longtin. He told Longtin that, if the injunctions were granted, neither he nor Drabek would be allowed on Mohave property. This, he said, would prevent them from performing their duties as subcontractors. Thereafter, Longtin decided to terminate Michaels. According to Longtin's testimony, he did so because Michaels had filed the petition, exaggerated the shoplifting incident, spoken rudely to Drabek in the telephone conversation of May 8, and called Guard Force employees "scabs." *Mojave Elec.*, 1998 WL 777462, at *8. Longtin conceded, however, that when he told Michaels that he was being terminated, he told him "of no other reason besides his having filed the petition." *Id.* On July 22, the municipal court denied both Michaels' and Douglas' petitions.

The ALJ concluded that the filing of the petitions was protected conduct under the NLRA, and rejected Mohave's contention that the filing was rendered unprotected because it constituted "disloyalty." Applying the familiar *Wright Line* test,[3] the ALJ found that a prima facie violation of section 8(a)(1) had been established because Mohave "admittedly fired [Michaels], at least in part, because of his having filed the petition," *id.* at *11, and because Mohave did not show that it would have fired Michaels in the absence of that protected conduct, *see id.* at *9–11. The NLRB affirmed.[4] Thereafter, Mohave petitioned

2. Douglas claimed "that he'd been physically and verbally assaulted by Nady, with Nady grabbing him by the shirt and shaking him." *Mojave Elec.*, 1998 WL 777462, at *6. Nady claimed "that any contact was merely incidental to being bumped as both were leaving the meter reading room." *Id.*

3. *See Wright Line,* 251 N.L.R.B. 1083 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981); *see also*

*NLRB v. Transportation Management Corp.,* 462 U.S. 393, 399–401, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (approving *Wright Line* test).

4. The ALJ also concluded that Michaels had been discharged because of anti-union animus in violation of NLRA § 8(a)(3), 29 U.S.C. § 158(a)(3). In light of its conclusion that Michaels was unlawfully discharged in viola-

this court for review, and the Board cross-petitioned for enforcement.

## II

As we have noted many times before, our role in reviewing an NLRB decision is limited. *See, e.g., Pioneer Hotel, Inc. v. NLRB*, 182 F.3d 939, 942 (D.C.Cir.1999); *Time Warner Cable v. NLRB*, 160 F.3d 1, 3 (D.C.Cir.1998). "We must uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *International Union of Electronic, Elec., Salaried, Mach. & Furniture Workers v. NLRB*, 41 F.3d 1532, 1536 (D.C.Cir.1994) (internal quotations and citation omitted). We are also required to give "substantial deference to the inferences drawn by the NLRB from the facts." *Time Warner Cable*, 160 F.3d at 3. Moreover, absent exceptional circumstances, we must accept the agency's determinations regarding the credibility of witnesses. *See Elastic Stop Nut Div. v. NLRB*, 921 F.2d 1275, 1281 (D.C.Cir.1990) (stating that "the Court must uphold Board-approved credibility determinations of an ALJ unless they are 'hopelessly incredible' or 'self-contradictory' ").

Mohave seeks to overturn the Board's finding that it committed an unfair labor practice on two principal grounds. First, it contends that Michaels' conduct in filing the injunction petition was unprotected be-cause it was "disloyal." Second, it contends that Michaels' activity was unprotected because it was inconsistent with the collective bargaining agreement. In addition, Mohave argues that even if it did discharge Michaels for protected activity, the remedy should be limited because the company would have fired him in any event based on evidence of unrelated misconduct it discovered after his termination.[5] We consider each of these arguments below.

### A

Section 7 of the NLRA guarantees employees the "right to self-organization, to form, join, or assist labor organizations, . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) of the Act implements that guarantee by declaring that "[i]t shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7]." *Id.* § 158(a)(1); *see PHT, Inc. v. NLRB*, 920 F.2d 71, 73 (D.C.Cir.1990). Thus, an employer violates section 8(a)(1) if it discharges an employee for engaging in concerted activity for the purpose of mutual aid or protection. *See, e.g., Prill v. NLRB*, 835 F.2d 1481, 1483 (D.C.Cir.1987). Moreover, the Supreme Court has confirmed that "the 'mutual aid or protection' clause protects employees from retaliation by their employers when they seek to improve working conditions through resort to

---

tion of section 8(a)(1) for filing the civil injunction petition, the Board found "no need to rely on the judge's conclusion that the discharge also violated Section 8(a)(3)." *Mojave Elec.*, 1998 WL 777462, at *1. Accordingly, that issue is not before us.

**5.** In the Statement of Facts section of its brief, Mohave suggests that Michaels was not fired solely for the filing of the petition, but rather due to a continuing "pattern" of disloyal actions including, inter alia, exaggerating the shoplifting incident, speaking rudely to Drabek, and calling Guard Force employees names. *See* Mohave Br. at 5–6; *see also id.* at

14. Even if this were true, there is substantial evidence to support the ALJ's conclusion that Mohave failed to overcome its *Wright Line* burden of showing it would have fired Michaels absent the filing of the petition. *See Transportation Management Corp.*, 462 U.S. at 401–03, 103 S.Ct. 2469 (holding that where protected activity is at least a "motivating factor," employer must show it would have taken same action in its absence). Moreover, as discussed below, there is substantial evidence to support the ALJ's finding that Michaels did not engage in the purported pattern of disloyal activity.

administrative and judicial forums." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565–66 & n. 15, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978) (citing with approval *Walls Mfg. Co.*, 137 N.L.R.B. 1317 (1962), *enforced*, 321 F.2d 753 (D.C.Cir.1963), and *Socony Mobil Oil Co.*, 153 N.L.R.B. 1244 (1965), *enforced*, 357 F.2d 662 (2d Cir.1966)).

■ Mohave does not dispute the ALJ's conclusion that the filing of a judicial petition—supported by fellow employees and joined by a co-employee—constitutes concerted action under the NLRA.[6] Nor does Mohave dispute that concerted action to ensure greater workplace safety through petitioning for injunctive relief may constitute protected conduct. Instead, it contends that Michaels' conduct was unprotected here because it was "disloyal," in that if granted, the injunction would have interfered with the business relationship between Mohave and Guard Force.

■ It is true that an employer may discharge an employee for disloyalty without committing an unfair labor practice.[7] But the fact that an employee's actions may cause some harm to the employer does not alone render them disloyal. *See NLRB v. Knuth Bros., Inc.*, 537 F.2d 950, 953 (7th Cir.1976). The activity at issue here involves the filing of a petition for judicial relief, and, as Mohave itself re-

cites, the "rule [is] that filing a 'civil action by a group of employees is protected activity *unless done with malice or in bad faith*.'" Mohave Reply Br. at 5 (quoting *Trinity Trucking & Materials Corp.*, 221 N.L.R.B. 364, 365 (1975)) (emphasis added).[8] Moreover, that the petition "was later dismissed on the pleadings would not, in itself make the activity unprotected or establish bad faith." *Trinity Trucking & Materials Corp.*, 221 N.L.R.B. at 365 (citing *Walls Mfg. Co.*, 137 N.L.R.B. at 1317).[9]

Mohave contends that Michaels' petition was in fact filed "with malice and in bad faith" because it was intended not to protect employees but rather to disrupt Mohave's relationship with Guard Force. Mohave Br. at 19. The ALJ, however, found to the contrary, and we affirm that finding as supported by substantial evidence. As the ALJ stated, "whether or not one regards Michaels' fears as totally realistic," it is not possible to conclude that they were baseless. *Mojave Elec.*, 1998 WL 777462, at *11. Testimony supported the ALJ's finding that "Nady did behave toward Michaels in an angry fashion, and did seek to find him for some sort of confrontation." *Id.* at *10; *see* Tr. at 80–81; General Counsel Ex. 10. Moreover, the ALJ observed that "Nady's imposing size and evident state of fitness would strike a disturbing chord in virtually any

---

**6.** *See, e.g., Prill*, 835 F.2d at 1483 (noting that complaint of single employee is deemed concerted action when taken "with the actual participation or on the authority of his co-workers"); *International Ladies' Garment Workers' Union v. NLRB*, 299 F.2d 114, 115–16 (D.C.Cir.1962) (finding concerted action where complaint letter written by single employee was "approved in advance by several other employees").

**7.** *See, e.g., NLRB v. Local Union No. 1229*, 346 U.S. 464, 471, 74 S.Ct. 172, 98 L.Ed. 195 (1953) (upholding discharge where employees publicly disparaged quality of employer's product, with no discernible relationship to pending labor dispute); *George A. Hormel & Co. v. NLRB*, 962 F.2d 1061, 1064 (D.C.Cir. 1992) (stating that employee violates duty of loyalty by supporting boycott of employer's product, unless boycott is non-disparaging and related to ongoing labor dispute).

**8.** *Accord Leviton Mfg. Co. v. NLRB*, 486 F.2d 686, 689 (1st Cir.1973); *Socony Mobil Oil Co.*, 357 F.2d at 663–64; *cf. Walls Mfg. Co.*, 321 F.2d at 754 (holding that complaint to state health department was protected conduct given lack of evidence that "the allegations were made with intent to falsify or maliciously injure the [employer]").

**9.** *See Walls Mfg. Co.*, 321 F.2d at 754 (upholding finding of lack of malice "notwithstanding the inaccuracy" of the complaint); *see also Hugh H. Wilson Corp. v. NLRB*, 414 F.2d 1345, 1351 n. 12 (3d Cir.1969) ("We are not concerned in this case with the merit or lack of merit of [the employee's] grievance.... [I]t is clear that Sec. 7 protects his right to utter it as a matter of concerted activity with other employees for mutual aid.").

man who learned as Michaels did that Nady had come onto [Mohave's] premises seeking a confrontation with him." *Mojave Elec.*, 1998 WL 777462, at *10. And as the ALJ also noted, "Michaels sought assurances for his safety" from Mohave, and "resorted to the filing of a petition only after such assurances were not given." *Id.*

The ALJ's observations are fully supported by Michaels' testimony, which the ALJ found to be of "superior" credibility— a determination to which we defer. Michaels testified without contradiction that he "felt very threatened" when he heard Nady had come looking for him, that he felt "the physical altercation between [Nady] and Douglas was actually directed towards [him]," and that he and Douglas filed their petitions to protect themselves from further harassment. Tr. at 184–90. Mohave officials conceded that Michaels communicated his safety concerns to the company both before and after the petitions were filed, *see id.* at 92–93, 337, and that he asked the company to take "some action to protect" him, *id.* at 85—a request Mohave initially put off with the suggestion to "give it a couple of days," *Mojave Elec.*, 1998 WL 777462, at *7; Tr. at 185. Although Mohave later "advised" Nady to leave any disciplining of its employees to the company, Michaels was not required to accept that admonition as providing him with sufficient protection.

▇ Mohave contends that the filing of the petitions should not be considered in isolation, and that Michaels' bad faith is evidenced by the fact that the filing was part of a long-term campaign to discredit Guard Force and sever its contractual relationship with Mohave. Other elements of this asserted campaign were Michaels' alleged exaggeration of the shoplifting incident, his allegedly rude telephone conversation with Drabek on May 8, his purported practice of calling Guard Force employees "scabs," and the fact that after the May 21 incident with Nady, Michaels filed a union grievance seeking the removal of Guard Force from Mohave's proper-

ty. The ALJ readily disposed of each of these claims, *see Mojave Elec.*, 1998 WL 777462, at *4 n. 6, and we find those dispositions reasonable. The ALJ determined based on witness demeanor that it was Mohave's supervisors rather than Michaels who had exaggerated the shoplifting incident. Supervisor Quinn concluded that Michaels had behaved properly in the May 8 telephone conversation with Drabek. The ALJ credited Michaels' denial that he had ever called Guard Force employees scabs, finding Longtin's contrary testimony to be internally "inconsistent[ ]" and a "makeweight." *Id.* at *8 n. 12. Finally, the filing of the union grievance in connection with the same conduct for which Michaels sought a civil injunction is itself a protected activity. *See, e.g., Illinois Ruan Transp. Corp. v. NLRB*, 404 F.2d 274, 284 (8th Cir.1968); *Walls Mfg. Co.*, 321 F.2d at 753.

We conclude that substantial evidence supports the Board's finding that Michaels did not file his petition out of bad faith or malice. Accordingly, we reject Mohave's contention that Michaels' conduct was "disloyal" and therefore unworthy of NLRA protection.

**B**

▇ Mohave also contends that the filing of Michaels' judicial petition was unprotected because it was "contrary to the express terms of the collective bargaining agreement between [Mohave] and Michaels' union." Mohave Br. at 20. That agreement, the company argues, not only "permit[ted] [Mohave] to contract with Guard Force, it specifically prohibited Michaels from interfering with that and other aspects of [Mohave's] operations." *Id.* at 20–21. Thus, the company contends, by seeking an injunction that would have impaired Guard Force's ability to fulfill its contract with Mohave, Michaels breached the CBA.

▇ Mohave is correct that conduct in breach of a collective bargaining agreement is one of "the normal categories of

unprotected concerted activities." *NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 17, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962). But its claim that Michaels breached the agreement at issue here is truly breathtaking in its scope. The company does not contend that the *filing* of the petition breached the agreement; rather, Mohave's contention is that the breach would occur *if the petition were granted.* "If granted," the company argues, an order directing Guard Force's owner and supervisor to stay away from Michaels' place of business would limit Mohave's ability "to enjoy the benefits of [its] contractual relationship" with Guard Force. Mohave Br. at 16. In essence, Mohave's contention is that if an employee asserts a right under state law to be free of physical harassment, and if a judge determines on the merits that a stay-away order is necessary to vindicate that right, the employee has violated the collective bargaining agreement struck between Mohave and the Union. Mohave is not dissuaded by the implications of this position. At oral argument, its counsel agreed this would mean that if an employee were sexually harassed by Mohave's president, it would be a breach of contract for the employee to seek a judicial restraining order. The employee's only recourse, counsel suggested, would be to sue the Union for having "shackled" the employee with a CBA that barred access to the courts.

It is doubtful that a collective bargaining agreement could waive an employee's statutory rights[10] in the manner claimed by Mohave.[11] But even if this were the kind of right that a CBA could waive, the Supreme Court has held that such a waiver must be "clear and unmistakable." *Wright v. Universal Maritime Serv. Corp.,* 525 U.S. 70, 80, 119 S.Ct. 391, 396, 142 L.Ed.2d

361 (1998) (holding that general arbitration clause in CBA did not waive employee's right to judicial forum for claim of employment discrimination). "We will not infer from a general contractual provision," the Court said, "that the parties intended to waive a statutorily protected right unless the undertaking is explicitly stated. More succinctly, the waiver must be clear and unmistakable." *Id.* (internal quotations omitted).

Nothing in the collective bargaining agreement at issue here even approaches this "clear and unmistakable" standard for waiver. The provision upon which Mohave relies bears the title "NO STRIKE" and reads as follows:

> During the terms of this Agreement, under no circumstances will the Union or the employees engage in, instigate, cause, permit, encourage, or take part in any strike, boycott, work stoppage, slowdown, cessation of work, interruption of work, sympathy strike, unfair labor practice strike, picket, curtailment of work, reduction of production, *or interference of any kind* with the operations of the Employer.

App. at 123 (emphasis added). As is immediately apparent, the provision does not mention the exercise of statutory rights or the filing of lawsuits at all. Rather, as its title makes clear, it is principally a no-strike provision, and the specific prohibitions it sets forth are all against work stoppages of one form or another. Although Mohave contends that the phrase we have italicized above, "or interference of any kind," gives the prohibition a wider scope, the canon of *ejusdem generis* ("of the same kind or class") counsels against our reading that general phrase to include conduct wholly unlike that specified in the

---

**10.** Michaels' petition was based on Ariz.Rev. Stat. § 12–1809, which authorizes courts to grant injunctions against harassment.

**11.** *See Barrentine v. Arkansas–Best Freight Sys., Inc.,* 450 U.S. 728, 745, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (holding that employees' rights under Fair Labor Standards Act are not waivable through collective bargain-

ing); *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 51, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (holding that CBA cannot prospectively waive employees' statutory rights under Title VII); *cf. Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 260, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994) (holding that Railway Labor Act does not preempt state-law causes of action that are independent of CBA).

immediately preceding list of prohibited acts. In any event, given the Supreme Court's admonition that we should not infer waivers of statutory rights unless they are "clear and unmistakable," we see nothing in this CBA to justify inferring a waiver of the proportions claimed by Mohave.[12]

### C

 Having rejected Mohave's arguments that Michaels' conduct was unprotected, we turn now to its alternative argument: that evidence acquired after Michaels' termination should limit his remedy. The NLRB awarded Michaels full reinstatement and backpay from the time of his discharge. *See Mojave Elec.*, 1998 WL 777462, at *1. Mohave disputes that award, contending that one week after it fired Michaels, it came upon evidence that would have resulted in his termination irrespective of the injunction petitions. That evidence was a statement by Guard Force employee Tammy Bauguess that, on a single occasion nine to ten months before his discharge, Michaels paid her five dollars to take part of his meter route. Mohave's operations manager, Tom Longtin, "testified unequivocally that he would have discharged Michaels for this action" as soon as he discovered it. Mohave Reply Br. at 9.

 To preclude reinstatement and limit backpay on the basis of after-acquired evidence, the employer has the burden of proving that the evidence reveals

misconduct for which it *"would* have discharged any employee," not simply for which it *could* have done so. *Marshall Durbin Poultry Co.*, 310 N.L.R.B. 68, 70 (1993) (emphasis added), *aff'd in relevant part*, 39 F.3d 1312 (5th Cir.1994); *see also John Cuneo, Inc.*, 298 N.L.R.B. 856, 856–57 (1990).[13] The NLRB affirmed the ALJ's determination that Mohave had not met that burden. *See Mojave Elec.*, 1998 WL 777462, at *1. Because the Board has "broad discretion" in fashioning remedial orders, *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 325, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994), we will uphold its decision as long as there is substantial evidence in the record to support it.

There is such substantial evidence here. The ALJ concluded that "even if [he] had found the events to have occurred as testified to by Bauguess,"[14] he could not credit Longtin's testimony that this kind of misconduct would alone have resulted in Michaels' discharge. *Mojave Elec.*, 1998 WL 777462, at *14. The "claimed seriousness" of the single alleged five-dollar bribe, the ALJ said, was substantially undercut by "Longtin's benign attitude" toward Bauguess, who purportedly had taken the bribe. *Id.* at *15. As Longtin admitted, he had "made no request or demand that [Bauguess] be disciplined by Guard Force." *Id.*; *see* Tr. at 385 (testimony of Longtin) (agreeing that it was "against the rules for [Bauguess] to accept the money," but conceding that he had not recommended that she be disciplined). "The

---

**12.** This case is therefore completely different from *Emporium Capwell Co. v. Western Addition Community Org.*, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975), urged upon us by petitioner. There, the Court held that conduct was unprotected by the NLRA where a group of employees attempted "to bypass the grievance procedure" set forth in their CBA, "in favor of attempting to bargain with their employer" separately and without their union. *Id.* at 67, 95 S.Ct. 977. Michaels endeavored neither to bypass the CBA's grievance procedure, nor to bargain separately with Mohave.

**13.** *Cf. McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 362–63, 115 S.Ct. 879,

130 L.Ed.2d 852 (1995) (holding in age discrimination suit that "[w]here an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge").

**14.** The ALJ also concluded that the alleged payment to Bauguess had not been made, stating that Michaels denied he had ever paid anyone to take his meter route. *See Mojave Elec.*, 1998 WL 777462, at *14. We have been unable to find that denial in the record before us.

fact that Longtin has taken absolutely no action against" her, the ALJ concluded, spoke "volumes" as to whether the five dollar bribe was an offense for which Michaels really would have been fired, *Mojave Elec.*, 1998 WL 777462, at *15, and "belied" Longtin's testimony that it was, *id.* at *12.

The inference drawn by the ALJ is a reasonable one. *See John Cuneo, Inc.*, 298 N.L.R.B. at 861 n. 10 (noting that treatment of similarly situated employees carries great weight in evaluating whether employer would have terminated employee for act of misconduct); *Axelson, Inc.*, 285 N.L.R.B. 862, 866 (1987) (holding that, to terminate backpay on basis of after-acquired evidence, employer must demonstrate that discovered misconduct "is not conduct of a sort that it has tolerated in the past").[15] Against it Mohave offers nothing more than Longtin's testimony, which the ALJ was entitled to reject as self-serving. *See Import Body Shop, Inc.*, 262 N.L.R.B. 1188, 1188 (1982) (viewing "with skepticism" rationale for discharge based on post-discharge evidence, since employer "already had manifested its intention to discharge [employee] for unlawful reasons"). Indeed, Mohave does not even attempt to explain why Bauguess escaped discipline for engaging in the same transaction for which the company claims it would have fired Michaels. Accordingly, we have no warrant for rejecting the Board's conclusion that Michaels should be awarded full reinstatement and backpay.

### III

For the foregoing reasons, Mohave's petition for review is denied, and the Board's cross-petition for enforcement is granted.

*So ordered.*

---

**15.** Although Bauguess was technically an employee of Guard Force rather than Mohave, Mohave exercised ultimate supervision over all meter readers. *See* Tr. at 269–70. Longtin specifically testified that he could demand the discharge of a Guard Force employee for misconduct. *See id.* at 365–66.