# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 20, 2017                    Decided April 28, 2017

No. 16-1276

MINTEQ INTERNATIONAL, INC. AND SPECIALTY MINERALS
INC., WHOLLY OWNED SUBSIDIARIES OF MINERAL
TECHNOLOGIES, INC.,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL UNION OF OPERATING ENGINEERS,
LOCAL 150, AFL-CIO,
INTERVENOR

———

Consolidated with 16-1335

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Maurice Baskin* argued the cause for petitioners. With him
on the briefs were *A. John Harper III*, *Jonathan O. Levine*, and
*Adam P. Tuzzo*.

*Eric Weitz*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney.

*Charles R. Kiser* argued the cause and filed the brief for intervenor. *Brian Powers* entered an appearance.

Before: GARLAND, *Chief Judge*, GRIFFITH, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: In 2012, employer-petitioner Minteq International, Inc. began requiring new employees to sign a Non-Compete and Confidentiality Agreement. The National Labor Relations Board found that Minteq violated section 8(a)(1) and (5) of the Fair Labor Standards Act by failing to afford the employees' union notice or an opportunity to bargain over Minteq's unilateral implementation of the requirement that employees sign the agreement. We deny Minteq's petition for review and enforce the Board's Order.

## I.

Minteq International, Inc. ("Minteq") sells the application of its proprietary refractory materials for the walls of furnaces used in the steel-making process, among other things. In 2012, Minteq's employees were represented by the International Union of Operating Engineers, Local 150, AFL-CIO and covered by a collective bargaining agreement ("CBA"). The

relevant CBA contained a management rights provision stating in part:

> Except as expressly modified or restricted by a specific provision of this Agreement, all statutory and inherent managerial rights, prerogatives, and functions are retained and vested exclusively in the Company, including, but not limited to, the rights: . . . to control and regulate the use of machinery, facilities, equipment, and other property of the Company; to introduce new or improved research, production, service, distribution, and maintenance methods, materials, machinery, and equipment; to issue, amend and revise work rules and Standards of Conduct, discipline steps, policies and practices; and to take whatever action is either necessary or advisable to manage and fulfill the mission of the Company and to direct the Company's employees.

The CBA also states:

> An employee who has never accrued seniority under this Agreement or an employee rehired shall be in "probationary" status until completion of six (6) months of employment. . . . The discipline, layoff or discharge of an employee who is in probationary status shall not be a violation of this Agreement.

Pursuant to the CBA, Minteq can discharge or discipline probationary employees without just cause or recourse to the grievance and arbitration process.

In 2012, without bargaining or giving notice to the Union, Minteq began requiring new employees to sign a Non-Compete and Confidentiality Agreement ("NCCA"). The agreement, approximately 4-1/2 pages long, includes fifteen substantive sections. Sections 1 and 2 are titled "Covenant Not To Compete" and "Confidential Information." These sections, among other things, prohibit employees from working for Minteq's competitors for eighteen months following their employment and prohibit the disclosure of confidential or proprietary information. Section 3, "Inventions," among other things, requires employees to assign to Minteq the rights to any inventions or "related know-how" developed during their employment with Minteq. The NCCA also included section 4 entitled "Interference with Relationships" and section 12 "At-Will Employee[s]." Minteq did not bargain with the Union before implementing the NCCA. Section 4 provides:

> **Interference with Relationships.** During the Restricted Period Employee shall not, directly or indirectly, as employee, agent, consultant, stockholder, director, partner or in any other individual or representative capacity intentionally solicit or encourage any present or future customer or supplier of the Company to terminate or otherwise alter his, her or its relationship with the Company in an adverse manner.

Section 12 states:

> **At-Will-Employee.** Employee acknowledges that this Agreement does not affect Employee's

status as an employee-at-will and that no additional right is provided herein which changes such status.

As with the agreement as a whole, Minteq did not notify the Union of the restrictions contained in these paragraphs or bargain with the Union over their use.  On October 30, 2014, the Union filed an unfair labor practice charge against Minteq for its failure to bargain with the Union over the NCCA.  After proceedings before an ALJ and an appeal by Minteq, on July 29, 2016, the Board issued its ruling.  The Board held that the Non-Compete Agreement was a mandatory subject of bargaining not covered by the parties' CBA.  Therefore, it held that Minteq violated the Fair Labor Standards Act (the "Act") by implementing it without first bargaining with the Union. The Board also held that Minteq separately violated the Act by implementing the Interference with Relationships and At-Will Employee provisions.  The Board ordered Minteq to cease and desist from utilizing the NCCA and to comply with other remedial conditions.  Minteq petitions for review.

## II.

### A.

The "classification of bargaining subjects as 'terms or conditions of employment' is a matter concerning which the Board has special expertise." *Local Union No. 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 685-86, (1965).  Therefore, "our general approach to a Board construction of the NLRA is quite deferential." *United Food & Commercial Workers Int'l Union, Local 150-A v. NLRB*, 880 F.2d 1422, 1433 (D.C. Cir. 1989) ("*UFCW*").  We must uphold the Board's determinations regarding which collective-bargaining subjects constitute mandatory subjects of

bargaining as long as the Board's determinations are "reasonably defensible." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497 (1979). However, the Court gives no special deference to the Board's interpretation of contracts, instead interpreting contracts *de novo. Int'l Bhd. of Elec. Workers, Local 47 v. NLRB*, 927 F.2d 635, 640-41 (D.C. Cir. 1991).

**B.**

**1.**

The Board's conclusion that the NCCA was a mandatory subject of bargaining is largely dispositive of the first issue before us, that is, whether the Board erred in holding that the imposition of the NCCA requirement for hiring constituted an unfair labor practice ("ULP"). The Act requires parties to bargain in good faith regarding "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(a)(5), (d); *see Ford Motor Co.*, 441 U.S. at 495-96. The Board asserts that the NCCA is a mandatory subject of bargaining because it directly "settle[s] an aspect of the relationship between the employer and the employees." *First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 676 (1981) (quoting *Allied Chem. & Alkali Workers, Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 177 (1971)). The Board noted that the NCCA "prohibits an employee from working for another company that might have any connection to [Minteq's] business both during his employment and for 18 months afterward, effectively imposing a cost in lost economic opportunities on employees as a consequence of working for [Minteq]." *Minteq Int'l, Inc.*, 364 N.L.R.B. No. 63, at 3 (July 29, 2016). It also "imposes economic opportunity costs on employees by broadly restricting their ability to benefit from their discoveries, inventions, and acquired knowledge related to working for" Minteq. *Id.* Thus, the NCCA has "a clear and

direct economic impact on employees—and thus represent[s] precisely the sort of matters suitable for collective bargaining." *Id.*; *cf. Pittsburgh Plate Glass*, 404 U.S. at 180 (suggesting that provisions affecting the future economic situation "of active workers are part and parcel of their overall compensation and hence a well-established statutory subject of bargaining").

The Board therefore rejected Minteq's argument that the provisions of the NCCA were at the core of entrepreneurial control with "only an indirect and attenuated impact on the employment relationship." *First Nat'l Maint.*, 452 U.S. at 677. This conclusion is consistent with longstanding, uniform Board precedent finding non-competition and non-disclosure requirements to be mandatory subjects of bargaining. *See Nat'l Ass'n of Gov't Emps.*, 327 N.L.R.B. 676, 676, 684 & n.8 (1999), *enforced*, 205 F.3d 1324 (2d Cir. 1999); *Lower Bucks Cooling & Heating*, 316 N.L.R.B. 16, 16, 22 (1995); *Bolton-Emerson, Inc.*, 293 N.L.R.B. 1124, 1124, 1129-30 (1989), *enforced*, 899 F.2d 104 (1st Cir. 1990). Because the Board's reasoning is "reasonably defensible," *UFCW*, 880 F.2d at 1433, we uphold its determination that the implementation of the NCCA is a mandatory subject of bargaining.

**2.**

Although implementation of the NCCA would typically be a mandatory subject of bargaining, Minteq relies on the theory that it had no duty to bargain over the implementation if the provisions of the NCCA were covered by the CBA. It is true that a "union may exercise its right to bargain about a particular subject by negotiating for a provision in the collective bargaining contract that fixes the parties' rights and forecloses further mandatory bargaining as to that subject." *Int'l Bhd. of Elec. Workers*, 927 F.2d at 640 (citations omitted). Otherwise put, "to the extent that a bargain resolves any issue, it removes

that issue *pro tanto* from the range of bargaining." *Connors v. Link Coal Co.*, 970 F.2d 902, 905 (D.C. Cir. 1992).

However, we agree with the Board that the CBA did not cover all of the NCCA's provisions. Interpreting the CBA *de novo*, we conclude that, at a minimum, nothing in the management-rights clause of the CBA permits Minteq to impose obligations on employees after they leave employment, as most of the NCCA's provisions purport to do. Nor does the management-rights clause permit Minteq to bind employees' "heirs, successors, and assignees." While the management-rights clause is a broad one, it is not limitless. In the clause, the parties agreed that the Company retains rights "including, but not limited to" certain enumerated rights. These enumerated rights are limited to traditional managerial prerogatives to make basic business decisions and govern conduct in the workplace, such as hiring, assigning and directing work, setting productivity standards, and issuing Standards of Conduct. The clause provides nothing with respect to the heirs and assignees of employees or to their further capacities after the end of employment. While the list of rights concludes with a general provision granting the Company the right to "take whatever action is either necessary or advisable to manage and fulfill the mission of the Company and to direct the Company's employees," J.A. 502, we do not read this phrase to "include conduct wholly unlike that specified in the immediately preceding list," *Mohave Elec. Co-op., Inc. v. NLRB*, 206 F.3d 1183, 1191-92 (D.C. Cir. 2000). In sum, it is not evident that the parties bargained, certainly not to agreement, on the subjects covered by the NCCA.

It was therefore unlawful for Minteq to unilaterally implement the entire NCCA. The Board concedes that, after the existing NCCA is rescinded, Minteq could lawfully implement unilaterally some aspects of the NCCA that do fall

within the CBA's coverage. But because Minteq does not argue that any portions of the NCCA are severable in a way that would permit the Board to rescind only those portions not covered by the clause, and because it is not necessary to our disposition, we do not determine which, if any, of the remaining aspects of the NCCA fall within the CBA.

**3.**

In addition to finding the general ULP for the imposition of the NCCA, the Board further concluded that two specific provisions of the agreement—section 4 covering interference with the relationships and section 12 titled At-Will Employee—constituted separate ULPs. The Board ruled that these provisions were overbroad and independently violated section 8(a)(1) of the Act. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" their section 7 rights to unionize and engage in related labor activities. 29 U.S.C. § 158(a)(1).

An employer violates section 8(a)(1) by maintaining an employment practice that "'would reasonably tend to chill employees in the exercise' of their statutory rights." *Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. NLRB*, 253 F.3d 19, 25 (D.C. Cir. 2001) (quoting *Lafayette Park Hotel*, 326 N.L.R.B. 824, 825 (1998)). Even if an employer's rule does not "'*explicitly* restrict[]' section 7 activity," the rule is nonetheless a violation if "employees would reasonably construe the language to prohibit" them from exercising their rights. *Guardsmark, LLC v. NLRB*, 475 F.3d 369, 374 (D.C. Cir. 2007) (quoting *Martin Luther Mem'l Home*, 34 N.L.R.B. No. 75, at *1-2 (May 19, 2004)). Board determinations as to whether an employer's conduct unlawfully interferes with protected activity "are entitled to considerable deference so

long as they are 'reasonably defensible.'" *Adtranz*, 253 F.3d at 25 (quoting *Ford Motor Co.*, 441 U.S. at 497).

It was at the least reasonably defensible for the Board to conclude that employees would reasonably construe the language of these provisions of the NCCA to prohibit section 7 activity. The Interference with Relationships clause, as set forth above, restrains an employee from "directly or indirectly . . . , solicit[ing] or encourag[ing] any . . . customer or supplier of the Company to terminate or otherwise alter his, her or its relationship with the Company . . . ."

The Board found that employees would reasonably read the language of the Interference with Relationships clause as a prohibition against "asking customers to boycott [Minteq's] products in support of a labor dispute with the Respondent," in violation of employees' section 7 rights. We have "recognized the right of employees to support a consumer boycott of their employer's products in connection with a labor dispute . . . ." *DIRECTV, Inc. v. NLRB*, 837 F.3d 25, 33 (D.C. Cir. 2016). We uphold the Board's determination that the Interference with Relationships provision could reasonably be construed to prohibit employees from soliciting customers for support in a labor dispute and thereby violates section 8.

Second, after six months of employment, the CBA imposes on Minteq a "just cause" standard for any discipline, suspension, or discharge. However, the At-Will Employee provision states that the

> Employee acknowledges that this Agreement does not affect Employee's status as an employee-at-will and that no additional right is provided herein which changes such status.

The Board found that employees "would reasonably doubt whether the CBA's 'just cause' provision remains in effect" after implementation of the At-Will Employee provision because "there is nothing in [the At-Will Employee provision], or the NCCA more broadly, that suggests that the rule applies only to new, probationary employees." We agree that an employee could reasonably construe this provision to make employees removable at will for the entire time they are employed, rather than only during the initial six-month probationary period as provided in the CBA.

Consequently, Minteq may not implement the Interference with Relationships or At-Will Employee provisions—regardless of whether they are covered by the CBA—because those provisions independently violate section 8(a)(1) of the Act.

\* \* \*

For the reasons set forth above, Minteq's petition for review is denied and the Board's Order is enforced.

*So ordered.*